```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
MARC PEKOWSKY,                         :
                    Plaintiff,         :
                                       :    12 Civ. 4090 (DLC)
          -v-                          :
                                       :    OPINION & ORDER
YONKERS BOARD OF EDUCATION and JANE    :
WERMUTH,                               :
                    Defendants.        :
                                       :
-------------------------------------- X
```

APPEARANCES:

For plaintiff:

Christopher D. Watkins
SUSSMAN & WATKINS
1 Railroad Ave., Ste. 3
Goshen, NY 10924

For defendant Yonkers Board of Education:

Vincent P. D'Andrea
THOMAS, DROHAN, WAXMAN, PETIGROW & MAYLE LLP
700 White Plains Rd.
Scarsdale, NY 10583

For defendant Jane Wermuth:

Michael A. Miranda
MIRANDA SAMBURSKY SLONE SKLARIN VERVENIOTIS LLP
240 Mineola Blvd.
Mineola, NY 11501


DENISE COTE, District Judge:

     Plaintiff Marc Pekowsky ("Pekowsky"), a music teacher in

the Yonkers School District, brought this action against the

Yonkers Board of Education ("BOE") and his former principal,

Jane Wermuth ("Wermuth"), alleging that defendants retaliated against him for exercising his First Amendment right to advocate on behalf of the teachers' union and his fellow union members as his school building's elected union representative.  Defendants each moved for summary judgment on February 7, 2014.  For the reasons set forth below, defendants' motions are denied.

**BACKGROUND**

The following facts are undisputed or, where factual disputes exist, the evidence is construed in the light most favorable to plaintiff and all reasonable inferences are drawn in his favor.  Pekowsky has worked as an instrumental music teacher in the Yonkers School District since 1996 and at Yonkers Middle High School ("YMHS") since 2004.  Pekowsky served as a representative for the teachers' union, the Yonkers Federation of Teachers ("YFT"), since 2008.

As a union representative, Pekowsky frequently dealt with YMHS's principal, Wermuth, since 2010, when she was appointed to YMHS.  Wermuth has admitted that she felt that Pekowsky was "difficult [to deal with] as a union rep."  Pekowsky recalls "numerous conversations" with Wermuth about "the impact of union rules . . . and how they were . . . 'handcuffing' [Wermuth] from doing things that she felt should be done and in a [manner] that she thought they should be done."

In the fall of 2011, Wermuth and Pekowsky butted heads

about teacher compensation.  The Yonkers School District cut money allocated to extracurricular activities, which teachers had been paid to supervise.  Wermuth asked YMHS teachers to continue to supervise those activities for a certain hourly fee, but the YFT believed that this violated a provision of the collective bargaining agreement.  Pekowsky toed the union line and opposed Wermuth's proposal.  Pekowsky recounts that in his meetings with Wermuth on the subject, "there were raised voices and angry tones of voice and flippant remarks about teachers and unions."

In October 2011, a teacher at YMHS, Nicole Roura ("Roura"), was faced with a parent complaint regarding a lesson in her classroom.  Wermuth advised Roura to use the YFT's alternate representative, Andrew Seligman ("Seligman"), instead of Pekowsky.  Pekowsky, accompanied by Seligman, confronted Wermuth about her advice to Roura.  Wermuth confirms that she told Pekowsky she did not wish to deal with him, accused him of lying, and told Seligman she would be "very happy" to deal with him instead.

The issue was raised with Wermuth again at the October 24, 2011 meeting of the Teachers' Interest Committee ("TIC"), which Pekowsky headed as YFT's representative.  Wermuth was informed that the YFT had been notified and that YFT had "brought it to the attention of Central School Administrators."  According to

minutes from the meeting, Wermuth responded: "Became frustrated with Mr. Pekowsky always elevating everything to emergency status.  Was trying to protect the teacher.  Will not happen again."

On Friday, January 27, 2012, Wermuth scheduled meetings with two teachers during fifth period to discuss concerns about teaching methods and excessive absences.  Wermuth informed Seligman of the meetings, who in turn told Pekowsky.  Pekowsky asked Wermuth to arrange coverage of his fifth-period class so that he might attend the meeting and represent the teachers; Wermuth told him, if he "c[ould]n't find coverage, [Pekowsky] shouldn't be there."  Pekowsky arranged for a fellow music teacher to cover his class and attended the meetings.  Wermuth was upset that Pekowsky had "excused himself from his own class . . . without administrative approval" and "made a mental note to revisit the issue" later.

Later that day, Pekowsky came upon two students in the hallway.  One, E.C., was a sixth- or seventh-grade student with a history of assaulting school staff.  Pekowsky asked what they were doing; E.C. told him to "fuck off" and ran away.  Pekowsky went to the main office to report the boys and found E.C. there.  According to a report by the school district's investigator, Pekowsky told E.C. to sit down and then stood in the doorway to prevent E.C. from running off.  When E.C. attempted to push past

him, Pekowsky blocked him with his chest, "chest bumping and
nudging" him.  E.C. then threatened Pekowsky, telling him he
would "fuck [him] up."  Pekowsky raised his voice to tell others
in the main office that such threats could not be tolerated.  A
secretary called Wermuth from her office; Wermuth then spoke
with E.C. and Pekowsky left the main office.  The month before,
E.C. had "kicked, punched, and spit on safety officers and also
attempted to bite [a] safety officer" and "threatened to shoot
[a] safety officer and blow up the school."  Wermuth and others
were already "working [to arrange] . . . hospitalization for
him."

Upon leaving the main office, Pekowsky encountered two
students and a student aide in the hallway.  Pekowsky, "in an
agitated state," asked if the students were supposed to be in
class.

That afternoon, Wermuth sent an e-mail to Louis Constantino
("Constantino"), the Chief Academic Officer for the district.
Constantino supervised Wermuth and reported to the
superintendent.  Wermuth began the e-mail by noting that
Pekowsky was present in one of the fifth-period meetings "to
represent the YTS," an apparent reference to the teachers'
union, the YFT.  Wermuth then wrote that "Pekowsky had an
incident" with a boy that "resulted in Mr. Pekowsky pushing the
boy.  I have witnesses."  She wrote that Pekowsky then proceeded

to go into a teacher's room to "scream[] at the students, 'The
teachers aren't going to take this from you!!'" and then to
"grab[] another student to push him into the room."  Wermuth
continued, "This whole situation is reprehensible.  People who
hate children should not work with them."  She concluded the
e-mail by noting, "I need support from the District.  I have
very little leverage with these tenured personnel."  Constantino
understood that Wermuth was asking him for "support" in order
"to take it further than just a letter of admonition" and to
"pull [Pekowsky] out of [the] building and have [him] report to
central office while an investigation [wa]s being conducted."
Constantino forwarded Wermuth's e-mail to the district's
investigator, Pasquale Piccirella ("Piccirella"), and asked him
to "give this priority #1 Monday morning."

     Wermuth and Constantino appear to have had a close working
relationship.  Wermuth and Constantino had discussed Pekowsky in
the past in connection with the TIC, when Wermuth told
Constantino that "Mr. Pekowsky was difficult to work with" and
was "making it difficult for [Wermuth] to respond appropriately"
in those meetings.  Wermuth and Constantino spoke about Pekowsky
and the January 27 incident that Sunday, January 29.  Sunday
evening, Constantino sent an e-mail to Vincent McPartlan, who
reported to Constantino, with copies to the superintendent,
Wermuth, and Piccirella.  Constantino, noting he had just spoken

with Wermuth, reported that "Mark [Pekowsky] lost control of
himself and caused a major scene in the main office with a
student and again in [a teacher's] classroom with other
students."  On January 30, Pekowsky was removed from YMHS
pending the outcome of Piccirella's investigation.

Piccirella, "a regular visitor" to YMHS, spoke with Wermuth
and then interviewed witnesses to the January 27 incidents.
Piccirella subsequently submitted a report to Constantino on
February 9 with his findings (the "Piccirella Report").  The
Piccirella Report concludes that Pekowsky "did block the doorway
of the main office with his body and chest bump and nudge [E.C.]
to prevent him from leaving," that E.C. threatened Pekowsky, and
that Pekowsky was "yelling in the main office."  Pekowsky then
"confront[ed] two students and a school aide . . . in an
agitated state."

Constantino recommended to the superintendent that Pekowsky
be removed from YMHS; the superintendent agreed.  On February
17, Constantino met with Pekowsky and told him he was being
transferred out of YMHS permanently and would be splitting his
time between two other middle schools.  Because of that
transfer, Pekowsky could no longer serve as YMHS's building
representative for the teachers' union.  At YMHS, Pekowsky
received stipends of $3,000 to $5,000 for participation in
certain after-school activities; no such opportunities existed

7

at the two schools to which Pekowsky was transferred.

At the February 17 meeting, Constantino gave Pekowsky a letter from Wermuth dated February 17 admonishing Pekowsky and warning him that similar behavior in the future might result in his termination (the "Wermuth Letter").  The first paragraph of the Wermuth Letter concerns Pekowsky's "abandon[ing] [his] fifth period class without authorization" to attend Wermuth's teacher meetings.  The letter then addresses Pekowsky's encounter with E.C., stating "corporal punishment is prohibited by law" and "direct[ing Pekowsky] to desist from ever deploying any manner of corporal punishment."  The Wermuth letter also states that Pekowsky's "shouting in the hallways . . . is insubordinate and rises to the level of conduct unbecoming a teacher."  Wermuth added the letter to Pekowsky's personnel file.

On May 23, 2012, Pekowsky filed the present action, alleging that Wermuth and the BOE retaliated against him for his union activities.  On February 7, Wermuth and the BOE each moved for summary judgment.  The motions became fully submitted on March 28.  For the reasons that follow, defendants' motions are denied.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination, the
court must view all facts in the light most favorable to the
non-moving party and draw all reasonable inferences in that
party's favor. Nunn v. Mass. Cas. Ins. Co., --- F.3d ---, 2014
WL 1924465, at *3 n.4 (2d Cir. May 15, 2014).  Once the moving
party has asserted facts showing that the non-movant's claims
cannot be sustained, the opposing party must set out specific
facts showing a genuine issue for trial, and cannot rely merely
on allegations or denials contained in the pleadings. See Fed.
R. Civ. P. 56(c); accord Fabrikant v. French, 691 F.3d 193, 205
(2d Cir. 2012).  "[C]onclusory statements, conjecture, and
inadmissible evidence are insufficient to defeat summary
judgment." Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317
(2d Cir. 2011) (citation omitted).

In cases involving claims of employment discrimination "an
extra measure of caution is merited" in granting summary
judgment because "direct evidence of discriminatory intent is
rare and such intent often must be inferred from circumstantial
evidence found in affidavits and depositions." Schiano v.
Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)
(citation omitted).  Nonetheless, "a plaintiff must provide more
than conclusory allegations to resist a motion for summary

judgment." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir.
2008). Ultimately, the test for summary judgment is whether "a
reasonable jury could return a verdict for the nonmoving party."
Nunn, 2014 WL 1924465, at *3 n.4 (citation omitted).

　　　To establish a First Amendment retaliation claim, a public
employee must show that he or she (1) engaged in protected First
Amendment activity, (2) suffered an adverse employment action,
and that (3) the protected activity was "at least a substantial
or motivating factor in the adverse employment action." Garcia
v. Hartford Police Dep't, 706 F.3d 120, 130 (2d Cir. 2013)
(citation omitted). To recover damages from an individual
defendant under 42 U.S.C. § 1983, a plaintiff must establish
that defendant's "personal involvement . . . in [the] alleged
constitutional deprivations." Spavone v. Dep't of Correctional
Servs., 719 F.3d 127, 135 (2d Cir. 2013). A defendant may still
avoid liability by proving that it would have "undertaken the
same adverse employment action even in the absence of the
protected conduct." Matusick v. Erie Cnty. Water Auth., ---
F.3d ---, 2014 WL 700718, at *10 (2d Cir. Jan. 3, 2014).

　　　The BOE contends that it is entitled to summary judgment on
several grounds: (1) Pekowsky's union activity was not protected
First Amendment activity; (2) Pekowsky's transfer and the
Wermuth Letter were not adverse employment actions; (3) there is
no causal relationship between Pekowsky's union activity and any

10

adverse action; and (4) the BOE would have taken the same actions regardless of Pekowsky's union activity.  Wermuth makes similar arguments in support of her motion, in addition to arguing that she is entitled to qualified immunity.  These arguments are considered in turn.

## I.   Protected Activity

A public employee's speech may be entitled to First Amendment protection where the employee spoke "as a citizen on a matter of public concern rather than as an employee on matters of personal interest."  Garcia, 706 F.3d at 130 (citation omitted).  Public employees speak as employees rather than citizens when they "make statements pursuant to their official duties."  Ross v. Breslin, 693 F.3d 300, 305 (2d Cir. 2012) (quoting Garcetti v. Ceballos, 547 U.S. 410, 421 (2006)).  In deciding whether speech is "pursuant to" the employee's official duties, courts "focus[] on whether the speech was part-and-parcel of his concerns about his ability to properly execute his duties."  Id. at 306 (citation omitted).

A "matter of public concern" is one that "relates to any matter of political, social, or other concern to the community." Singer v. Ferro, 711 F.3d 334, 339 (2d Cir. 2013) (citation omitted).  Courts are to look to "the content, form, and context of a given statement, as revealed by the whole record," and consider "whether the speech was calculated to redress personal

grievances or whether it had a broader public purpose." Id.
(citation omitted).  Private speech to one's employer on such
matters, as well as public speech, is protected.  See Givhan v.
W. Line Consol. Sch. Dist., 439 U.S. 410, 415-16 (1979)
("Neither the [First] Amendment itself nor [the Court's]
decisions indicate that this freedom [of speech] is lost to the
public employee who arranges to communicate privately with his
employer rather than to spread his views before the public.");
accord Jackler v. Byrne, 658 F.3d 225, 235-36 (2d Cir. 2011).
Whether the speech is on a matter of public concern and whether
the plaintiff spoke as a citizen or employee are both questions
of law.  See Singer, 711 F.3d at 339.[1]

Here, Pekowsky's advocacy on behalf of the teachers' union,
and on behalf of other teachers in his capacity as
representative of the union, is protected speech.  It is
undisputed that when Pekowsky met with Wermuth regarding teacher
supervision of extracurricular activities, and when he
ultimately opposed Wermuth's proposal, he did so as a union

---

[1] Even where a public employee speaks as a citizen on a matter of
public concern, First Amendment protections do not attach if
"the interests of the employer in providing effective and
efficient public services" outweigh "the employee's First
Amendment right to free expression." Singer, 711 F.3d at 339
(citation omitted).  Defendants have not proffered any BOE
interest that would override Pekowsky's right to advocate on
behalf of the teachers' union or fellow union members in the
manner he did.

representative.  Likewise, when Pekowsky confronted Wermuth
about counseling teachers not to use Pekowsky, their union
representative, and had the union contact Wermuth's superiors
about her conduct, he was acting as union representative.  And
when Pekowsky advocated on behalf of fellow union members in
meetings with the administration, he spoke as a union
representative, not as a teacher.  "Given the inherent
institutional conflict of interest between an employer and its
employees' union," Pekowsky acted as a private citizen, not in
furtherance of his public duties, "when speaking as a
representative of the [teachers'] union."  Ellins v. City of
Sierra Madre, 710 F.3d 1049, 1060 (9th Cir. 2013); accord Fuerst
v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006).

    Pekowsky has adduced evidence that he was championing
teachers' due process rights, insisting on union representation
for teachers, and opposing Wermuth's compensation proposal
regarding extracurricular supervision.  Union representation of
teachers is a matter of importance to the functioning of our
public education system.  It is a feature of contemporary public
debates.  Consequently, Pekowsky's speech was on a matter of
public concern and is protected.[2]  Accordingly, Pekowsky's speech

---

[2] Pekowsky does not argue that his union activities are protected
regardless of public concern.  If he did, it would be necessary
to address issues related to the First Amendment right of
association.  The Second Circuit has "questioned whether the

13

was protected.  Cf. Clue v. Johnson, 179 F.3d 57, 60 (2d Cir. 1999) ("There is no doubt that retaliation against public employees solely for their union activities violates the First Amendment.").

Defendants argue that Pekowsky's union activity is not protected speech because it was "directed at redressing personal workplace grievances," citing cases in which employees complained about their own circumstances.  These cases are inapposite.  Pekowsky's advocacy on behalf of fellow teachers was not aimed at redressing his own grievances, but was undertaken as a representative of the teachers' union.

Defendants also contend that Pekowsky's activity was not a matter of public concern because "[a]ny difficulties between [Wermuth] and [Pekowsky] were the result of their inability to get along and not plaintiff's union advocacy."  The motivation for Wermuth's actions is a question of causation.  It does not affect whether Pekowsky's advocacy was on a matter of public concern.

_____

public concern test is appropriate" in so-called "hybrid" cases involving the intersection of associational and speech rights, as application of the test to a body of speech by (or on behalf of) an association is "awkward."  See Melzer v. Bd. of Educ., 336 F.3d 185, 196 (2d Cir. 2003).  Since the public concern test is clearly met here, there is no need to explore this issue further.

## II.  Adverse Employment Action

To prove a First Amendment retaliation claim, a plaintiff must establish an adverse employment action that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  Wrobel v. Cnty. of Erie, 692 F.3d 22, 31 (2d Cir. 2012) (citation omitted). Although "'petty slights, minor annoyances, and simple lack of good manners will not' give rise to actionable retaliation claims," Millea v. Metro-N. R. Co., 658 F.3d 154, 165 (2d Cir. 2011) (quoting Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 68 (2006)), the standard is "broad" and adverse actions may "take a wide variety of forms," Anemone v. Metro. Transp. Auth., 629 F.3d 97, 120 n.14 (2d Cir. 2011) (citation omitted). In addition to "harsh measures" like discharge, pay cuts, and reprimands, "[t]he list of [recognized] adverse actions has included . . . some lesser sanctions, such as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying."  Wrobel, 692 F.3d at 31.  "Context matters, as some actions may take on more or less significance depending on the context."  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 25 (2d Cir. 2012) (citation omitted).  "[A]lleged acts of retaliation must be evaluated separately and in the aggregate, as even trivial acts may take on greater significance

when they are viewed as part of a larger course of conduct."
Id. (citation omitted).

Here, Pekowsky was involuntarily transferred out of YMHS in
2012, a school in which he had taught since 2004.  Pekowsky's
new assignment required that he split his time between two
schools, and to move between the two one day each week.  At
YMHS, Pekowsky earned additional pay for work with
extracurricular activities; no such opportunities existed at his
two new schools, and as a consequence Pekowsky's pay is less
than it was.  A reasonable jury could find that Pekowsky's
transfer constituted an adverse employment action.  Cf. Kessler
v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205,
209-10 (2d Cir. 2006) (holding a lateral transfer may be an
adverse action even when the transfer did not affect the
employee's salary, benefits, or hours).

The same is true of the Wermuth Letter.  That letter, which
was placed in Pekowsky's personnel file, "direct[s Pekowsky] to
desist from ever deploying any manner of corporal punishment."
The Wermuth Letter also states that Pekowsky's "shouting in the
hallways . . . is insubordinate and rises to the level of
conduct unbecoming a teacher" and concludes by advising that a
repeat of such behavior may result in Pekowsky's discharge.
Such a letter may well "lead [an] employee to believe (correctly
or not) that his job is in jeopardy," and accordingly might

16

dissuade a similarly situated teacher from union advocacy. Millea, 658 F.3d at 165 (holding that a letter of reprimand may constitute an adverse action "even when . . . the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently").

Defendants point out that Pekowsky filed a grievance with the union about his transfer and subsequently settled it, in return for the DOE's agreement to assign Pekowsky to a single school.  Defendants claim that Pekowsky is now "contented with this assignment," but that does not change the above analysis.

## III. Causal Connection

To establish a causal connection between the protected activity and the adverse action, a plaintiff need only show that the activity was "at least a substantial or motivating factor in the adverse employment action." Garcia, 706 F.3d at 130 (citation omitted).  A retaliation claim will lie even where "the measures taken by defendants were otherwise justified," so long as plaintiff can prove that retaliation was a "motivating factor." Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene, 746 F.3d 538, 544 (2d Cir. 2014) (citation omitted). Similarly, "the fact that [a defendant] had other legitimate reasons [for the action] is irrelevant." Skehan v. Vill. of Mamaroneck, 465 F.3d 96, 107 (2d Cir. 2006), overruled in

17

unrelated part by <u>Appel v. Spiridon</u>, 531 F.3d 138 (2d Cir.
2008).

Here, a reasonable jury could find that Pekowsky's
protected union activity was a motivating factor in the decision
to transfer Pekowsky and to place the Wermuth Letter in his
file.  There is evidence, including purported statements from
Wermuth herself, that Wermuth's hostility toward Pekowsky was a
reaction to his advocacy on behalf of the union.  Wermuth played
a critical role in both of the adverse actions at issue here.

Wermuth's connection to the Wermuth Letter is obvious.  A
reasonable jury could find that Wermuth also played a role in
Pekowsky's transfer.  Constantino has said he understood that
Wermuth was asking him to hold an investigation, and he launched
Piccirella's investigation with an e-mail to Piccirella that
forwarded Wermuth's e-mail to Constantino about the incident.
Wermuth's e-mail evidences her animosity to Pekowsky and
suggests Wermuth's personal investment in the outcome of the
investigation -- in particular, her statement that "Pekowsky
push[ed] the boy.  I have witnesses."  She calls the "whole
situation" with Pekowsky "reprehensible" and seems to suggest
that Pekowsky be removed from his job, writing that "People who
hate children should not work with them," and that "I need
support from the District.  I have very little leverage with
these tenured personnel."  Notably, Wermuth's e-mail begins with

18

a reference to the fact that Pekowsky was present at the fifth-period teachers meeting to represent the teachers' union.

Constantino forwarded this e-mail to Piccirella with the request that he "give this [investigation] priority #1 Monday morning" and a note that Constantino would be "speak[ing] to Jane [Wermuth] over the weekend for more details related to the incident."  That Sunday, Constantino sent a follow-up e-mail, on which Piccirella was copied, noting that he had spoken with Wermuth and advising that "Mark lost control of himself and caused a major scene in the main office with a student and again in [a teacher]'s classroom with other students."

While defendants claim Pekowsky was transferred to safeguard students' safety, the DOE offers no persuasive reason why a safety concern arising from an incident with a sixth- or seventh-grade student would be properly addressed by transferring Pekowsky to work in two other schools with sixth- and seventh-graders.  Given this evidence, a reasonable jury could find that the Wermuth Letter and Pekowsky's involuntary transfer were motivated, at least in part, by Wermuth's reaction to Pekowsky's union activity.

Defendants argue that Pekowsky has failed to create a material issue of fact as to causation because there is a gap between "the first time [Pekowsky's] union advocacy came into direct conflict with Defendant Wermuth" in September 2010 and

the date Pekowsky was involuntary transferred, February 17,
2012.  The cases the BOE cites concern a causal inference drawn
solely on the basis of timing.  Here, there is evidence of a
continuing conflict between Pekowsky and Wermuth based on
Pekowsky's union activity that reached a head at the end of
2011, and Pekowsky proffers evidence apart from timing that
suggests a retaliatory motive.

Finally, Wermuth erroneously contends that "there is no
proof that the District Administrators who decided to transfer
plaintiff had any knowledge of his union activity."  Yet,
Wermuth's January 27 e-mail to Constantino about the Pekowsky
"incident" notes in the first paragraph that Pekowsky was
present at Wermuth's fifth-period teacher meetings "to represent
the YTS" -- an apparent reference to the YFT, the teachers'
union -- and Constantino admitted that Wermuth had complained to
him previously about Pekowsky in connection with TIC meetings,
which Pekowsky headed as union representative.

## IV.  *Mt. Healthy* Defense

Defendants may escape liability, pursuant to Mt. Healthy
City School District Board of Education v. Doyle, 429 U.S. 274
(1977), if they can prove that they would have taken the same
adverse actions in the absence of the protected activity.
Anemone, 629 F.3d at 114.  But, "if there are significant
questions as to whether an employer would have [taken the same

action against] an employee but for his/her speech, summary
judgment is precluded." Hale v. Mann, 219 F.3d 61, 70 (2d Cir.
2000).  On the record here, a reasonable jury could find that
Pekowsky would not have been transferred, and the Wermuth Letter
would not have been written, had Wermuth not borne animus
against Pekowsky because of his union activities.

**V.   Qualified Immunity**

Qualified immunity "protects public officials performing
discretionary functions from personal liability in a civil suit
for damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known." Vincent v. Yelich, 718
F.3d 157, 166 (2d Cir. 2013) (citation omitted).  A right is
"clearly established" where "the contours of the right are
sufficiently clear that a reasonable official would understand
that what he is doing violates that right." Id. (citation
omitted).  Courts expect "a reasonably competent public official
[to] know the law governing his conduct." Id. (citation
omitted).  And where, as here, "specific intent is actually an
element of the plaintiff's claim as defined by clearly
established law, it can never be objectively reasonable for a
government official to act with the intent that is prohibited by
law." Reuland v. Hynes, 460 F.3d 409, 419 (2d Cir. 2006)
(citation omitted).

It was clearly established, well before 2012, that "governmental entities may not inflict an adverse employment decision upon an employee in retaliation for the employee's exercise of his First Amendment rights," and "no reasonable [government] officer could hold a contrary belief." Skehan, 465 F.3d at 107 (citation omitted). And it has long been clearly established that union activity like Pekowsky's here is protected by the First Amendment. See, e.g., Clue, 179 F.3d at 60. A reasonable official would have known that it is illegal to retaliate against a union representative for zealously advocating on behalf of the union by involuntarily transferring that representative or by drafting a letter of reprimand containing baseless charges concerning corporal punishment and placing that letter in the representative's personnel file.

In addition to disputing the above, Wermuth contends that she "was not involved in" and "did [not] influence [Constantino's] decision" to transfer Pekowsky. A reasonable jury could find otherwise. Wermuth does not dispute that she is responsible for the charges leveled in the Wermuth Letter, which she authored. Accordingly, Wermuth is not entitled to qualified immunity.

### CONCLUSION

Defendants' February 7 motions for summary judgment are

denied.


SO ORDERED:

Dated:     New York, New York
           May 29, 2014

                        _____
                              DENISE COTE
                        United States District Judge